SUFFEL, Trustee, Appellant, vs. McCARTNEY NATIONAL BANK, Respondent.

*January 10—February 23, 1906.*

*Bankruptcy: Preferential payments: Insolvency: Notice: Questions of fact.*

1. When the creditor of one subsequently adjudicated a bankrupt receives a payment without reasonable cause to believe the debtor insolvent or that he intended thereby to give a preference, although the facts known to the creditor, at the time of the payment, were such as would naturally produce in the mind of a reasonably intelligent man a doubt or suspicion of solvency, and such as would put a reasonably prudent man on inquiry, such payment is not preferential.

2. Grounds for reasonable belief in a present inability of a debtor to pay debts in the course of business are not necessarily grounds for believing that his property, at a fair valuation, is not sufficient to pay his debts.

3. Whether the creditor of a bankrupt in receiving a payment had reasonable cause to believe that a preference was intended is a question of fact determinable by the jury or trial court.

APPEAL from a judgment of the circuit court for Brown county: S. D. HASTINGS, Circuit Judge. *Affirmed.*

May 7, 1902, Charles F. Dickinson was adjudged a bankrupt, and the plaintiff was thereupon appointed trustee of his estate and qualified as such. July 3, 1902, the plaintiff, as such trustee, commenced this action to recover $1,350 alleged to have been paid to the defendant by Dickinson April 5, 1902, as a fraudulent preference. The defendant answered by way of admissions, denials, and counter allegations, among others to the effect that up to the time of such bankruptcy proceedings, May 7, 1902, the defendant and all its officers believed said Dickinson to be solvent and able to pay all his debts, and had no reason to believe otherwise, and that such payment by Dickinson to the defendant was received by this defendant in good faith and in the ordinary course of business and without any intention of securing a preference over his other creditors. A trial by jury having been waived and trial had, the court at the close thereof found as matters of fact: (1) That at the time Dickinson paid to the defendant the sums alleged in the complaint and admitted in the answer he was insolvent; (2) that the amount so paid by the defendant was a greater percentage on Dickinson's indebtedness than his estate will pay to other creditors, and was a preference; (3) that the cashier of the defendant bank, who transacted its business in regard to said debt and payment, did not, at the time of the payment, believe Dickinson to be insolvent, and none of the officers of the defendant bank then believed him insolvent; (4) that neither the cashier of the bank nor any of its officers, at the time said payment was made, had reasonable cause to believe Dickinson insolvent nor that it was intended by said payment to give preference to the defendant; (5) that the facts known to the cashier of the defendant bank, at the time of said payment, were such as would naturally produce in the mind of a reasonably intelligent man a doubt or suspicion of Dickinson's solvency, and were such as would put a reasonably prudent man upon inquiry, if the bankrupt law required the same diligence of creditors con-

cerning preferential payments that is required of grantees in cases of fraudulent conveyances. And as conclusions of law the court found that the plaintiff is not entitled to recover in this action and that the defendant is entitled to judgment dismissing the complaint upon its merits, and for costs. From the judgment entered in favor of the defendant in accordance with such findings, and for costs, the plaintiff appeals.

*John A. Kittell* and *Samuel H. Cady,* for the appellant.

*C. W. Lomas,* for the respondent.

CASSODAY, C. J. In reaching the conclusions mentioned in the foregoing statement the trial judge, in a lengthy and carefully prepared opinion, reviewed the evidence as to Dickinson's dealings with the bank during the three years immediately preceding such payment, and all facts tending to show what knowledge the cashier of the defendant, and its other officers, had acquired during those three years as to Dickinson's financial circumstances. It does not appear that Dickinson did business with any other bank during the three years mentioned. It appears from such summary, among other things, that Dickinson's business was selling musical instruments on long time, payable in instalments, secured by leases on the instruments sold; and that such business required a considerable capital in proportion to the volume of business, and so he obtained loans from the bank, giving such leases as collateral. As early as in 1899 the cashier of the bank was induced by Dickinson to believe that his father-in-law, who was a man of means and had done considerable for his two sons, had also advanced, as a gift to Dickinson's wife, $1,700. January 1, 1900, Dickinson submitted to the bank a statement showing his assets to be $8,003.86 and liabilities $2,791; and in January, 1901, he referred to the same statement as still showing his financial condition. In May, 1901, Dickinson borrowed from the bank $1,200, giving notes therefor with his father-in-law as joint maker; and he then told the cashier

that he wanted that amount to pay off all his indebtedness aside from what he owed the bank. The notes were not paid at maturity, but, as they were considered perfectly good, they were allowed to remain. January 1, 1902, Dickinson gave the bank an inventory of his stock, and a statement of his liabilities as being $2,000 aside from what he owed the bank. In the latter part of that month his entire stock of goods was destroyed by fire, and a few days later his household effects were destroyed by fire, but he held policies of insurance upon his stock of goods to the amount of $4,750, of which $3,250 was in companies represented by the defendant's cashier as agent, and $1,000 on his household effects, of which $500 was in a company then represented by the defendant's cashier, and the bank then held leases, as collateral, to the amount of $900, and, from what Dickinson told him, the cashier supposed he had quite an amount of other leases. About that time the cashier learned that he owed other indebtedness to the amount of at least $2,000, and that about March 29, 1902, some small claims were being pressed for payment, and some of his checks were unpaid for want of funds. Some time between the fires and March 29, 1902, the cashier inquired of Dickinson whether he intended to resume business and was told by Dickinson that he had about arranged with his creditors to pay them fifty per cent. of the amount due them at once, and that they would give him time to pay the balance. About March 29, 1902, the fire losses were adjusted and paid. The bank's claim against Dickinson was secured by notes on which his father-in-law was joint maker and regarded as perfectly good. Nevertheless the cashier asked Dickinson to take up the notes with the insurance money, but did not insist on such payment. Dickinson, however, offered to make payment, and so the same was paid April 5, 1902, as stated.

Such is a general outline of the evidence upon which the court, among other things, found, in effect, that at the time of making such payment neither the defendant's cashier nor any

of its officers believed Dickinson to be insolvent, nor had they or any of them, at that time, reasonable cause to believe him to be insolvent, nor that it was intended by said payment to give preference to the defendant. Such findings seem to have covered the issues in the case, and determined the same in favor of the defendant. But the court went further and found, in effect, that the facts known to the cashier, at the time of such payment, were such as would naturally produce in the mind of a reasonably intelligent man a doubt or suspicion of Dickinson's solvency, and were such as would put a reasonably prudent man upon inquiry, if the bankrupt law required the same diligence of creditors concerning preferential payments that is required of grantees in cases of fraudulent conveyances. The obvious meaning of this language, when construed in connection with the other findings mentioned, is that the court held, as a matter of law, that the present bankrupt act does not require the same diligence of creditors concerning preferential payments that is required of grantees in cases of fraudulent conveyances; and hence, that the facts known to the cashier at the time of receiving the payment, though sufficient to produce in his mind a doubt or suspicion of Dickinson's solvency, yet that they were insufficient to prove that the cashier had at the time reasonable cause to believe that Dickinson was then insolvent, or that in making such payment he intended to give a preference to the defendant. This is in harmony with the conclusion of the lengthy opinion of the trial judge, where he said, in effect, that the point to be decided was somewhat difficult, but a considerable reflection had led him to the conclusion that the knowledge of facts and circumstances possessed by the cashier was well calculated to produce a doubt or raise a suspicion in the mind of an ordinarily intelligent man as to Dickinson's solvency, but not such as was calculated to produce a *belief* of it; and as that was essential to the plaintiff's cause of action, he could not recover. Such findings of fact seem to be sustained by the evidence.

Are the conclusions of the trial court in accordance with the law applicable to the case? It was held by the supreme court of the United States under the bankrupt act of 1867:

"In order to invalidate, as a fraudulent preference within the meaning of the bankrupt act, a security taken for a debt, the creditor must have had such a knowledge of facts as to induce a reasonable belief of his debtor's insolvency." *Grant v. National Bank,* 97 U. S. 80, 82.

Mr. Justice BRADLEY, speaking for the whole court, there said:

"Hence the act, very wisely, as we think, instead of making a payment or a security void for a mere suspicion of the debtor's insolvency, requires, for that purpose, that his creditor should have some reasonable cause to believe him insolvent. He must have a knowledge of some fact or facts calculated to produce such a belief in the mind of an ordinarily intelligent man."

That case and that language were expressly sanctioned in *Barbour v. Priest,* 103 U. S. 293, 297. The same is true of a still later case where it was held:

"A creditor dealing with a debtor whom he may suspect to be in failing circumstances, but of which he has no sufficient evidence, may receive payment or take security without necessarily violating the bankrupt law. When such creditor is unwilling to trust the debtor further, or feels anxious about his claim, the obtaining additional security or the receiving payment of the debt is not prohibited, if the belief which the act requires is wanting." *Stucky v. Masonic Sav. Bank,* 108 U. S. 74, 2 Sup. Ct. 219.

In considering the adjudications under the bankrupt act of March 2, 1867 (ch. 176, 14 U. S. Stats. at Large, 517), it should be observed that the words "insolvent" and "insolvency" contained in secs. 35 and 39 of that act (14 U. S. Stats. at Large, 534, 536) had a very different meaning than they have under the present bankrupt act. Thus it was held early under the bankrupt act of 1867:

"By insolvency, as used in the bankrupt act when applied to traders and merchants, is meant inability of a party to pay

his debts, as they become due, in the ordinary course of business." *Toof v. Martin,* 13 Wall. 40, 47; *Wager v. Hall,* 16 Wall. 584, 601.

The present bankrupt act declares:

"(15) A person shall be deemed insolvent within the provisions of this act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, or removed, or permitted to be concealed or removed, with intent to defraud, hinder or delay his creditors, shall not, *at a fair valuation, be sufficient in amount to pay his debts.*" Act July 1, 1898, ch. 541, 30 U. S. Stats. at Large, 544, § 1, (15), 2 Supp. R. S. U. S. 844 [U. S. Comp. St. 1901, p. 3419].

To have reasonable cause to believe that a trader or merchant is unable to pay his debts as they become due in the ordinary course of business is a very different thing than to have reasonable cause to believe that the aggregate amount of the debtor's available property and assets is insufficient in amount, at a fair valuation, to pay his debts. This distinction is pointed out by Federal Judge LOWELL of Massachusetts in a very recent case, where it was held:

"Grounds for reasonable belief in the present inability of a debtor to pay his debts in the course of business are not necessarily grounds for believing that he is insolvent within the definition of insolvency contained in" the present bankrupt act "so as to require the creditor to surrender payments received as preferences." *In re Pettingill & Co.* 135 Fed. 218, 220.

It is there said by the court:

"Grounds for reasonable belief in a present inability to pay debts in the course of business are not necessarily grounds for believing that a man's property at a fair valuation is not sufficient to pay his debts."

In construing the clause of the bankrupt act here in question (sec. 60*b,* 30 U. S. Stats. at Large, 562 [U. S. Comp. St. 1901, p. 3445]), it has been held by the circuit court of appeals of this circuit, in an opinion by Judge JENKINS:

"In determining whether taking of security by a creditor constitutes an illegal preference . . . the creditor is not to be charged with knowledge of his debtor's financial condition from mere nonpayment of his debt, or from circumstances which give rise to mere suspicion in his mind of possible insolvency. On the other hand, it is not essential that the creditor should have actual knowledge of, or belief in, his debtor's insolvency, but it is sufficient if he has reasonable cause to *believe him insolvent.* If facts and circumstances with respect to the debtor's financial condition are brought home to him such as would put an ordinarily prudent man upon inquiry, the creditor is chargeable with knowledge of the facts which such inquiry should reasonably be expected to disclose." *In re Eggert,* 102 Fed. 735, 43 C. C. A. 1; *S. C.* 98 Fed. 843.

That case was cited with approval by this court in the recent case of *Jackman v. Eau Claire Nat. Bank,* 125 Wis. 465, 485, 104 N. W. 98, 105. As held in that case and the *Eggert Case,* the question whether in receiving the payment the defendant's cashier had reasonable cause to believe that a preference was intended was a question of fact determinable by the jury or trial court. *Kaufman v. Tredway,* 195 U. S. 271, 25 Sup. Ct. 33. We find no error in the record.

*By the Court.*—The judgment of the circuit court is affirmed.