## In re BARTLETT.

(District Court, M. D. Pennsylvania. September 22, 1909.)

### No. 923, in Bankruptcy.

1. BANKRUPTCY (§ 163*)—SECURED DEBT—PLEDGES—ENFORCEMENT.

Where a bank to which a bankrupt was indebted, at a time when the bank had no reason to believe the bankrupt was insolvent, advanced to him $2,077.24 to compromise with his creditors on the strength of a bill of sale of the bankrupt's stock, the pledge was enforceable in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 247; Dec. Dig. § 163.*]

2. BANKRUPTCY (§ 166*)—PLEDGES—PREFERENCES—REASONABLE CAUSE TO BE-LIEVE THAT DEBTOR WAS INSOLVENT.

Where a bankrupt, by executing a bill of sale of his stock to defendant bank, secured an extension of his loans from the bank and money to clear up his current accounts, the bank taking precautions to ascertain by an independent expert examination of the bankrupt's business that he was not then insolvent, the lien so procured was enforceable in bankruptcy to the extent of the note secured, but not for claims assigned to the bank in the course of the compromise made by the bankrupt with his creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 254; Dec. Dig. § 166.*]

In the matter of F. W. G. Bartlett, bankrupt. On exceptions to the report of referee sur claim of First National Bank of Sayre to the proceeds of certain personal property. Exceptions overruled.

L. T. Hoyt and H. F. Maynard, for exceptions.
J. C. Ingham and E. M. Dunham, for claimant.

ARCHBALD, District Judge. In 1906 F. W. G. Bartlett, the present bankrupt, was engaged in the jewelry business at Sayre, Pa., and was indebted on merchandise account something over $6,000, in addition to which he owed the First National Bank of Sayre $4,300 for borrowed money, his wife $1,000 and interest, his uncle, F. W. Bartlett, $124.05, and Frederick Job $196.95. Being embarrassed by his debts, he decided to try and effect a compromise with his creditors, which he finally succeeded in doing in August of that year, obtaining $2,077.24 from the bank named for that purpose, which increased his indebtedness to it to $6,377.24. To secure this, he gave the bank a note with confession of judgment for that amount, and also executed a bill of sale of his stock in trade, fixtures, and book accounts to R. F. Page, the cashier; it being agreed that the proceeds of sales and collections over and above the expenses of conducting the business and replenishing the stock should be applied to extinguishing the obligation, the bankrupt being given six months to redeem in. The bill of sale was executed August 28, 1906, and Page took immediate possession under it. He was recognized by the landlord as tenant of the building and paid rent. The insurance on the stock was transferred to his name, and additional policies taken out by him. A new set of books was opened and the business carried on in his name, the sign being changed, and the trade notified of his ownership, and a statement of his financial

condition being required of him. Agents came to him to have him buy new goods, and none were bought except by his direction. The proceeds of sales also were turned over to him and deposited in bank and checked out by him. The bankrupt lived in rooms in the rear of the store, and was to remain as clerk and devote his time and attention to making sale of the stock, but was allowed to get whatever he could out of his workbench, which was not included in the bill of sale, and was supposed to be good for $100 a month to him. After a few months' experience of this arrangement, however, the bank was not satisfied with it. Some $840 was paid on their note, but the stock, according to their observation, was depleted very much more than that, the bankrupt getting the money, and not turning it over to them. They therefore entered up judgment December 13, 1906, issued execution, and caused the stock to be levied on. The bankrupt thereupon, on December 15, filed a voluntary petition in this court, and was duly adjudicated, the execution being stayed, a receiver appointed, and the store put in his charge. Subsequently, as trustee, he disposed of the property covered by the bill of sale, realizing $2,900 out of it. The bank, through Page, laid claim to the property, and resisted the sale which was made subject to their rights, an understanding being had with the trustee that they should be remitted to the proceeds without prejudice. The trustee having filed his account, the referee awarded the fund to the bank, and it is to this action that exception is now taken.

There can be no question as to the right of the bank to be repaid out of the fund the $2,077.24 advanced to the bankrupt to compromise with his creditors. The additional loan so accorded him was made on the strength of the bill of sale, and, as the bank had the right to dictate the terms on which it would part with its money, the security agreed to at the time must be respected in bankruptcy the same as elsewhere. Hiscock v. Varick Bank, 206 U. S. 28, 27 Sup. Ct. 681, 51 L. Ed. 945; In re Busby (D. C.) 124 Fed. 469, 10 Am. Bankr. Rep. 650. Not that the bill of sale gave absolute title to the bank, or to Page as their representative; the property being merely held as collateral security. To complete the pledge, of course, it was necessary that possession should be taken, and without this it was not enforceable. Fourth National Bank v. Millbourne Mills (C. C. A.) 172 Fed. 177. But that formality was complied with, Page assuming charge, and his authority over the property being expressly recognized. It is true that the bankrupt remained in the store, but in a subordinate position, at his bench, as to which no one could be mistaken. Having done everything therefore to assert its rights, the bank is entitled to have the pledge enforced in its favor. It is of no consequence that the property was levied on at the instance of the bank as belonging to the bankrupt. It was his, subject to the pledge, and the execution was merely another means of divesting his interest. The referee was clearly right, therefore, in directing payment to the bank out of the fund of this much of its indebtedness.

But the rest of the claim is not so easily disposed of. As to the existing indebtedness of $4,300 at the time the bill of sale was given, there was an apparent preference, which having been secured within

four months of bankruptcy was subject to avoidance. It was only void-able, however, in case the bankrupt was insolvent, and there was reasonable cause to believe that a preference was intended, both of which are disputed. The bankrupt, of course, was embarrassed; his condition being such that he had to go to his trade creditors with a compromise. But embarrassment is not always insolvency, although it suggests it, and the bank was therefore put on inquiry. The bank knew, also, that it was being secured in full, where other creditors were getting but a fraction. And while it supposed that all the indebtedness outside of its own, except that of Frederick Job, was taken care of by the compromise, it ran the chance of there being others, and, as it now turns out, the bankrupt also owed his wife and uncle.

There are other considerations, however, by which the bank is blameless. It may be conceded that, except for the compromise, the bankrupt was insolvent, his indebtedness being close to $12,000, and his assets, at top figures, several hundred dollars less than that. But, if he was, the bank had no idea of it. And they took pains to inform themselves. Hendelman, an experienced jeweler, made an inventory for them and reported the stock and fixtures on a loan basis, 25 per cent. below cost, as worth $7,425.76, with good accounts of a $1,000; beside which there was the Massachusetts real estate worth $400 or $500; making a total of about $9,000. Against this, with the reduction secured by the compromise, which must be considered in the reckoning, there was but $6,500 of indebtedness that they knew of, including their own, which left a fair margin. The bankrupt, also, three months before that had made a statement showing that he was worth a good deal more than this, which, to a certain extent, they had the right to rely on. And the very offer of a compromise suggested an excess of assets, without which there was no inducement for it. With everything taken care of in this way, except their own and the small debt of Job, and more than enough property, as supposed, to meet it, how can it be said that in taking the security which they did they had reasonable cause to believe that they were getting an intended preference over other creditors? The fact is that the transaction was nothing more than one of ordinary business character, the bankrupt by a pledge of his stock securing an extension of his loans at bank, and at the same time getting money to clear up his current accounts, and go on, which bankruptcy does not assume to interfere with. The pledge, as so made, being good, therefore, not only for the indebtedness created at the time, but for the past indebtedness also, the proceeds of the sale, so far as it would go, must be applied to its repayment. The bank, of course, can only claim on the note, and not for the debts which were assigned to it in the course of the compromise, and the proof of debt, if it is to stand at all, not having been filed within the year, is to be corrected accordingly. The bank is also entitled only to the proceeds of the property covered by the bill of sale, and not to the balance shown by the account of the trustee, assuming that there is a difference. But subject to these restrictions, having the right, by virtue of the pledge, to the repayment of the debt which it was given to secure, the money was properly awarded to the bank, and the exceptions to the action of the referee must therefore be overruled.