### In re GAYLORD et al.

(District Court, N. D. New York. August 6, 1915.)

1. BANKRUPTCY ⬥166—PREFERENTIAL TRANSFERS—INSOLVENCY.

Under Act July 1, 1898, c. 541, § 60b, 30 Stat. 562, as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799, and Act June 25, 1910, c. 412, § 11, 36 Stat. 842 (Comp. St. 1913, § 9644), providing that if a bankrupt shall have made a transfer of any of his property, and if at the time of the transfer, being within four months before the filing of the petition, the bankrupt be insolvent and the transfer then operates as a preference, and the person benefited thereby shall then have reasonable cause to believe that the enforcement of such transfer would effect a preference, it shall be voidable, the creditor must have had reasonable cause to believe that the financial condition of the debtor at the time when the transfer was made was such that the security when enforced would work a preference; i. e., that the debtor was then insolvent.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–253, 255–258; Dec. Dig. ⬥166.]

2. BANKRUPTCY ⬥166—PREFERENTIAL TRANSFERS—INTENT.

Under Act July 1, 1898, § 60b, as amended by Act Feb. 5, 1903, § 13, and Act June 25, 1910, § 11, providing that if a bankrupt shall have made a transfer of any of his property while insolvent, and such transfer operates as a preference, and the person benefited thereby shall then have reasonable cause to believe that it would so operate, it shall be voidable, the intent of the debtor in making the transfer, or of the person receiving it is immaterial if he then had reasonable cause to believe that the taking and enforcement of the security would enable him to obtain a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–253, 255–258; Dec. Dig. ⬥166.]

3. BANKRUPTCY ⬥166—PREFERENTIAL TRANSFERS—REASONABLE CAUSE.

Under Act July 1, 1898, § 60b, as amended by Act Feb. 5, 1903, § 13, and Act June 25, 1910, § 11, providing that if a bankrupt shall have made a transfer of his property while insolvent and within four months before the filing of the petition, and the person receiving it shall have reasonable cause to believe that the enforcement thereof would effect a preference, it shall be voidable, the creditor taking the security need not actually know of the insolvency of his debtor, nor need he actually believe that the security and its enforcement would work as a preference, if facts and circumstances, with the knowledge of which he is chargeable, are such as

would cause an ordinarily careful and prudent man of intelligence and reasonable experience in business to believe that the taking and enforcement of the security would effect a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–253, 255–258; Dec. Dig. ☞166.]

4. BANKRUPTCY ☞303—PREFERENTIAL TRANSFERS—AVOIDANCE—BURDEN OF PROOF.

Under Act July 1, 1898, § 60b, as amended by Act Feb. 5, 1903, § 13, and June 25, 1910, § 11, providing that if a bankrupt shall have made a transfer of any of his property while insolvent and within four months of the filing of the petition, and the person receiving it shall have reasonable cause to believe that its enforcement would effect a preference, it shall be voidable by the trustee, the burden of proof is on the trustee to show the insolvency of the debtor when the security was given; that other creditors then existed; that the enforcement of the security would operate to give them a lesser percentage of their debt than the secured creditor will receive; and that such creditor had reasonable cause to believe that he would obtain such preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. ☞303.]

5. BANKRUPTCY ☞166—PREFERENTIAL TRANSFERS—INSOLVENCY.

Where a creditor made adequate inquiry and came to the conclusion, justified under the evidence, that his debtor was not insolvent, although the fact was otherwise, the taking of a chattel mortgage to secure a previous indebtedness within four months prior to the filing of the debtor's petition in bankruptcy did not constitute the taking of a preference under Act July 1, 1898, § 60b, as amended by Act Feb. 5, 1903, § 13, and Act June 25, 1910, § 11, providing that if a bankrupt shall have made a transfer of any of his property, and if at the time of such transfer the bankrupt be insolvent and the transfer then operates as a preference, and the person benefited thereby shall then have reasonable cause to believe that its enforcement would effect a preference, it shall be voidable by the trustee, since where a creditor makes inquiry and information is suppressed or so colored that the creditor does not obtain the information which would give him reasonable cause to believe that the debtor was insolvent, such knowledge cannot be imputed to him.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–253, 255–258; Dec. Dig. ☞166.]

In Bankruptcy. In the matter of Charles M. Gaylord and another, comprising the firm of the Crescent Park Market, bankrupts. Review of an order of the referee in bankruptcy, allowing the claim of George C. Woodworth as an unsecured claim, but denying it as a secured claim, by virtue of a chattel mortgage executed by the bankrupts. Order reversed, and claim allowed as a secured claim.

Del B. Salmon, of Schenectady, N. Y., for trustee in bankruptcy.

Hiram C. Todd and Wm. Brown, both of Saratoga Springs, N. Y., for claimant.

RAY, District Judge. August 20, 1913, an involuntary petition in bankruptcy was filed against Charles M. Gaylord and John A. Day, copartners composing the firm trading and doing business as and under the name of Crescent Park Market, and in due course adjudication followed, September 8, 1913. Prior to that time, and extending over a considerable period of time, Sulzberger & Sons Company of America, doing a general wholesale meat business, had sold divers quantities of

meat to said Crescent Park Market, a retail dealer, on credit, and June 27, 1913, the now bankrupt was owing to said Sulzberger Company (so-called for brevity) the sum of $2,803.21 on past-due accounts. Several requests and demands of payment were made, but not complied with, and on said June 27, 1913, said Gaylord and said Day, composing such firm, Crescent Park Market, executed and delivered to said Sulzberger Company a chattel mortgage to secure such indebtedness. July 12, 1913, $300 was paid on such mortgage, and July 19, $200 was paid, leaving a balance of $2,303.21. The mortgaged property has been sold and the proceeds paid into court to await determination of the validity, as against the trustee in bankruptcy, of said chattel mortgage as a lien which was subsequently, with the debt represented thereby, duly sold and transferred for value to George C. Woodworth, the claimant herein. In addition to the payments made on said chattel mortgage, as above stated, there was paid on said account June 26, 1913, the day before the chattel mortgage was given, the sum of $680.28. The trustee objected to the allowance of said claim as a secured claim, alleging that such mortgage, if enforced, would constitute and work a preference under the facts and the provisions of the Bankruptcy Act, and also insisted that such claim should only be allowed as unsecured on condition that the said payments on account, in all $1,180.28, all made within four months of the filing of the petition in bankruptcy, be returned to the trustee. A careful examination of the evidence satisfies this court that this mortgage was not given or received with intent to hinder, delay, or defraud creditors, or for that purpose, or with any actual fraudulent intent or purpose. It was given to secure the payment of a pre-existing indebtedness. The claimant, Woodworth, assignee of Sulzberger Company, is in the same position that company was—no better, no worse. The question is: Should this claim be disallowed as a secured claim for the reason a preference was given and the enforcement of the mortgage would work a preference forbidden by the provision of the Bankruptcy Act? Act of 1898, as amended February 5, 1903, and June 25, 1910.

"A person shall be deemed to have given a preference if, being insolvent, he has, within four months before the filing of the petition, * * * made a transfer of any of his property, and the effect of the enforcement of such * * * transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class." Section 60a.

"If a bankrupt shall * * * have made a transfer of any of his property, and if, at the time of the transfer, * * * and being within four months before the filing of the petition in bankruptcy * * * the bankrupt be insolvent and the * * * transfer then operate as a preference, and the person receiving it or to be benefited thereby or his agent acting therein, shall then have reasonable cause to believe that the enforcement of such * * * transfer would effect a preference it shall be voidable by the trustee and he may recover the property or its value from such person." Section 60b.

It is not disputed that the Crescent Park Market was insolvent at the time this chattel mortgage was executed and delivered, but it is not claimed that it was very largely so. The counsel for the trustee claims in his brief the assets were worth $6,000, and that the liabilities

were $8,000. Between the dates of June 10 and June 27, 1913, the referee finds the indebtedness was about $12,000 to $13,000. The assets did not increase. The now bankrupt firm purchased meats of the Sulzberger Company at its three branches on credit payments therefor to be made weekly, and the evidence shows these payments were promptly made up to June 10, 1913. Between June 10th and June 26th only one payment was made, and the account had increased to $3,483.92 when the payment of $680.25 was made, as stated.

One Hall was the local manager of the Sulzberger Company and knew both Gaylord and Day. Between June 10th and June 27th, when the chattel mortgage was given, said Hall on several occasions asked both Gaylord and Day for a check for the amount then owing, and a check was refused. Mr. Gaylord, on more than one occasion when such requests were made, told Hall he would not give a check unless they had the money in bank to meet it. Mr. Hall also knew the fact that there were differences between the partners, Gaylord & Day, and that Day had said unless Gaylord acceded to his terms he would "smash the business," while Gaylord claimed their financial difficulties arose from the fact that Day had not put in capital as he had agreed to do. On or a day or two prior to June 26, 1913, Mr. Hall went to the law office of one James C. Cooper in relation to the claim of the Sulzberger Company against the now bankrupt, and Mr. Gaylord was sent for. Mr. Cooper says, and I think correctly, and the referee so finds, that the following took place:

"I said to him: 'Now Mr. Gaylord, some arrangement has to be made looking toward the payment of this claim of Sulzberger & Sons Company. I am the attorney for these people, and I insist that you make some arrangement.' He said, 'Don't start any action.' I said, 'I am prepared to collect this claim.' I said, 'From your statement to me I can collect 100 cents on the dollar if I sue.' 'But,' he said, 'If you do start suit everybody else will start and we haven't the money convenient to pay,'" etc.

The referee also finds, and this court concurs in the finding:

"On June 26, 1913, Carl O. Norlinger, credit man of the Sulzberger & Sons Company, whose territory does not include Schenectady, received a wire from Chicago to go to Schenectady, where he arrived on June 27th, and talked with Mr. Gaylord at his store. Later in the day Mr. Gaylord and Mr. Day went to the office of Sulzberger & Sons Company in Schenectady, where were present Mr. Hall, Mr. Nowinski, Mr. Hudson, the manager of the Troy branch, and perhaps the manager of the Albany branch. Mr. Norlinger inquired about the outstanding accounts due the firm, and wanted to help Mr. Gaylord collect them so that he could apply the proceeds on their account, and for that purpose made a list, but Mr. Gaylord said that it would be very poor policy to interfere with this, as it would hurt his business if he had to take an outsider to help get them in. Mr. Gaylord said: 'Suppose we give you a chattel mortgage on the place; will that satisfy you?' And Mr. Norlinger said, 'I told him it would, provided the list of the fixtures up there would equal our claim.' Mr. Norlinger examined the fixtures and went to see whether there was any previous chattel mortgage recorded against them."

From these findings we conclude that Mr. Gaylord had the idea the Crescent Park Market was solvent. Evidently he expected it would continue business, as he did not desire to "hurt his business" by having some outsider interfering with the collection of accounts due the firm. The insistence of the Sulzberger Company in collecting the account,

then grown to more than $3,000, might show or warrant the inference, under some circumstances, that that company had doubts of the continued ability of the now bankrupts to pay. This was coupled with the fact that the account was growing, and no payments as agreed upon were being made. We may properly infer that this creditor regarded the outstanding accounts, if collected, sufficient to meet its claim, and regarded dilatory collections as the evil, and not insolvency. In fact the attorney, Mr. Cooper, in effect declared confidence in the solvency of the firm. He said, "From your statements to me I can collect 100 cents on the dollar if I sue."

[1] No mortgage was demanded or requested. The giving of it was suggested by Mr. Gaylord. It does not appear that either party had bankruptcy in mind during these negotiations. However, it is evident that both parties knew that if payment on all hands by all creditors was pressed, bankruptcy might ensue, and that in such event the enforcement of the mortgage would work a preference; that is, enable it to obtain a greater percentage of its debt than any other of the creditors of said Crescent Park Market of the same class. It must be conceded that every creditor of a person or firm who takes security from his creditor for a past-due indebtedness, by way of chattel mortgage, knows that its enforcement will work a preference if insolvency then exists and bankruptcy follows. But this is not enough to avoid the transfer. The creditor must have reasonable cause to believe, etc. The words, "shall then have reasonable cause to believe that the enforcement of such judgment or transfer, would effect a preference" not only refers to the time when the transfer is made, that is, when the mortgage is given, but means that the creditor taking it must then have had reasonable cause to believe that the then financial condition of the creditor was such that the enforcement of the security would work a preference as between the then existing creditors of the same class. In short, the creditor, or his agent acting in the matter, must have had such information at the time as gave him reasonable cause to believe that the taking of the transfer would, as to then existing creditors, if the transfer were later enforced, enable such creditor to obtain a greater percentage of his debt than any other of such creditors of the same class. This necessarily means that the creditor taking the security, or his agent acting in the matter, must have had reasonable cause to believe such debtor was then insolvent, and insolvency must then have existed, as otherwise the enforcement of the security could not work a preference.

[2] I do not see that the intent of the debtor is of any consequence, as the Bankruptcy Act now, since the amendments of 1910, reads. The statute, as it now reads, does not concern itself with the intent of the debtor in giving the transfer. Herron Co. v. Moore, 208 Fed. 134, 125 C. C. A. 356, 31 Am. Bankr. Rep. 221; In re Harrison (D. C.) 28 Am. Bankr. Rep. 684, 197 Fed. 320; In re Herman (D. C.) 31 Am. Bankr. Rep. 243, 207 Fed. 594; 2 Remington on Bankruptcy, § 1400. So the intent of the person taking the security or receiving the transfer is immaterial, provided he then had reasonable cause to believe the taking and enforcement thereof would enable him to obtain a greater per-

centage of his debt than would other creditors of the same class then existing. This constitutes the taking of a preference by him, even if he thought the debtor might pull through, keep up his business, make money thereon, and eventually pay all his creditors 100 cents on the dollar. This is interpreting the statute exactly as it reads. So far as intent is involved, the mere act of taking the security demonstrates that the creditor's intent was to get his pay in full, or so far as his security would go, whether other creditors get their pay or not. Therefore reasonable cause to believe that the debtor is insolvent and cannot pay in full, accompanied by the taking of security which, if enforced, will give the creditor his pay to the exclusion of other then existing creditors, or his pay in greater proportion than the other creditors of the same class will receive, makes such security voidable by the trustee if given and accepted within the four months preceding the filing of a petition in bankruptcy, and the debtor was in fact insolvent.

Of course we can argue and reason that if the debtor was in fact insolvent and the creditor knew it and took his security with such knowledge, or with reasonable cause to believe such was the condition, then the creditor must have intended to secure a preference. This is undoubtedly true. But his hopes, expectations, and even his honest belief that the creditor would prosper in business, make money, and eventually pay all his creditors in full does not validate a security taken under the circumstances and conditions named.

[3] In Remington on Bankruptcy (2d Ed.) vol. 2, §§ 1397 to 1407, inclusive, pp. 1274 to 1288, inclusive, this subject is made quite clear. A preference is not necessarily actually fraudulent, and it is not necessary to prove that the creditor taking the security actually knew the insolvent condition of his debtor giving it, or that he actually believed the security and its enforcement would work or operate as a preference. The existence of facts which came to the creditor's knowledge, or as to which facts he had such information as put him on inquiry in taking the security, or transfer, may establish reasonable cause to believe. If the facts and circumstances proved in the case to have been within the knowledge and observation of the creditor, or as to which he was actually put on inquiry, and inquiry would have disclosed, were such as would naturally cause a business man of ordinary care and intelligence—an ordinarily careful and prudent man of intelligence and reasonable experience in business matters—to believe, then it may properly be held, and should be held, that the creditor had reasonable cause to believe the debtor was insolvent, and that the taking and enforcement of the security or transfer "would effect a preference." See cases supra.

[4] The burden of proof is on the trustee alleging the invalidity or voidability of the transfer. 2 Remington on Bankruptcy (2d Ed.) § 1404, p. 1285; Calhoun County Bank v. Cain, 152 Fed. 983, 82 C. C. A. 114, 18 Am. Bankr. Rep. 509. He must prove the insolvency of the debtor, later bankrupt, at the time the security was given. He must establish the existence of other creditors of the same class at that time, and that the enforcement of the security or transfer will operate to

give them a lesser percentage of their debt than the secured creditor will receive by reason of his security given by such debtor, and he must also prove the existence of the "reasonable cause to believe." All this must be done by a fair preponderance of all the evidence in the case, and where inferences from proved facts are to be drawn, the rule obtains that if two inferences of substantially equal weight may reasonably be drawn from the proved facts, then that inference shall prevail which sustains the transfer or security.

"Reasonable cause for belief that a preference would be effected by the transaction necessarily involves reasonable cause to believe that the debtor was in fact insolvent. And this means reasonable cause for belief that his assets at a fair valuation do not equal his liabilities." 2 Remington on Bankruptcy (2d Ed.) § 1402, p. 1282; Merklein v. Hurley (D. C.) 197 Fed. 183; In re Lorch & Co. (D. C.) 199 Fed. 944; In re Carlile (D. C.) 199 Fed. 612; In re Pettingill & Co. (D. C.) 135 Fed. 218; Suffel v. Natl. Bank, 16 Am. Bankr. Rep. 262, 127 Wis. 208, 106 N. W. 837, 115 Am. St. Rep. 1004. However, "Merely because some cause to suspect the insolvency of the debtor exists is not enough; there must be such knowledge of facts (actual or implied knowledge) as would induce a reasonable belief in the ordinary man that a preference would result." 2 Remington on Bankruptcy (2d Ed.) § 1405, p. 1285; Grant v. National Bank, 97 U. S. 80, 81, 24 L. Ed. 971; Stucky v. Masonic Savings Bank, 108 U. S. 74, 75, 2 Sup. Ct. 219, 27 L. Ed. 640; Bardes v. Bank, 12 Am. Bankr. Rep. 771, 122 Iowa, 443, 98 N. W. 284; Turner v. Fisher (D. C.) 13 Am. Bankr. Rep. 243, 133 Fed. 594; Off v. Hakes, 15 Am. Bankr. Rep. 699, 142 Fed. 364, 73 C. C. A. 464.

In Grant v. National Bank, supra, Mr. Justice Bradley said:

"It is not enough that a creditor has some cause to suspect the insolvency of his debtor; but he must have such a knowledge of facts as to induce a reasonable belief of his debtor's insolvency, in order to invalidate a security taken for his debt."

In Off v. Hakes, supra (C. C. A. seventh circuit) 142 Fed. 364, 73 C. C. A. 464, 15 Am. Bankr. Rep. 696, it was held:

"In an equitable action to recover the amount of the note as an alleged preference, evidence that defendant's agent was informed by the bankrupt that, should the stock of goods be sold at what they were then estimated to be worth, the ability to pay creditors in full would depend upon the collection of an unknown amount of outstanding accounts is not sufficient to sustain a finding that the defendant had reasonable cause to believe that the bankrupt was insolvent, and that a preference was intended."

Financial embarrassment is not necessarily insolvency, but may, under certain circumstances, suggest it and put the creditor on inquiry. In re Bartlett (D. C.) 172 Fed. 679, 22 Am. Bankr. Rep. 891.

[5] In the case now before this court it seems inquiry was made and resulted in the honest conclusion arrived at by Mr. Cooper, the attorney for the Sulzberger Company, that he could collect 100 cents on the dollar if he sued. This, of course, indicates inquiry by him and an honest belief in the solvency of the Crescent Park Market. The now bankrupt was not paying its weekly bills as they fell due, and had not from June 10, to June 26, 1913. A check was requested, and Mr. Gaylord declined to give one on the ground he would not give a check unless there was money in bank to meet it. As it is contrary to law in New York to give a check on a bank when the maker of the check has no funds, we cannot predicate any finding on the mere fact

Mr. Gaylord declined to give a check. What force under all the circumstances can be given the fact the Crescent Park Market had not sufficient funds in bank to meet a check for the amount of the indebtedness? It is not shown that company did not have property which, if turned into cash and deposited, would have met such a check, or that the outstanding accounts receivable would not, if collected, have furnished funds for the purpose. As stated, inquiry was made, and we must assume that the representative of the Sulzberger Company believed the information given was correct and truthful, as evidenced by the statement that the full claim was collectible. It is true that business houses should have funds in bank, or on hand, to pay all outstanding bills and claims when due. But failure to be in funds, while a circumstance to be considered, does not of itself give reasonable cause to believe that the house or individual is insolvent. See In re Houghton Web Co. (D. C.) 26 Am. Bankr. Rep. 202, 204, 205, 185 Fed. 213. In that case the bankrupt was short of funds, discounted notes, and on at least three occasions its notes went to protest. The referee found the bankrupt was insolvent and short of funds and without sufficient capital to do business, but took into account other facts, as we must do here. What is there in this case to show that, after receiving the information referred to, and which led to the conclusion the debtor was able to pay in full, the Sulzberger Company had reasonable cause to believe the enforcement of the transfer made to it as security would effect a preference? Day had threatened, unless he could have his way, "to smash the business." We may assume Day had agreed to put in capital, which he had failed to do. This failure would account for a shortage of ready cash, but would not show insolvency. It does not appear Day had actually done anything "to smash the business," except fail to put in all the capital he had agreed to put in. However, it does not appear that such failure would make the company a bankrupt, or insolvent. If so, no such knowledge or information was conveyed to Sulzberger Company. It is evident that the whole truth was not conveyed to the agents of the Sulzberger Company, but they made inquiry, and it cannot be held that when a creditor does his duty and makes inquiry and the truth is suppressed, or only half told, he is charged with knowledge of the actual truth. When put on inquiry and there is a failure to inquire, it may be presumed that inquiry would have disclosed the truth, all the facts; but when put on inquiry, and due inquiry is made and the truth is either wholly suppressed or so colored and explained that the creditor taking the security does not, in fact, have the information which would give reasonable cause to believe, knowledge cannot be imputed to him and he held to have had reasonable cause to believe. This is not a case where the creditor took a transfer by way of security of substantially all the property of the debtor with knowledge of the existence of other creditors. The accounts receivable were untouched, thus leaving this debtor free to collect in all outstanding accounts, which it seems were represented to Sulzberger Company as sufficient to pay its claim of over $3,000, and continue its business. As already stated, it seems clear that it was expected the Crescent Park Market would continue

225 F.—16

its business, was able to do so, and the findings of the learned referee indicate nothing to the contrary. In this case we find no resort to unusual methods of payment or of giving security when demanded. In Re Andrews (D. C.) 14 Am. Bankr. Rep. 247, 135 Fed. 599, there was a payment by return of goods, not by cash. In Laundy v. First National Bank, 11 Am. Bankr. Rep. 223, 66 Kan. 759, 71 Pac. 259, there was a deposit of the books of account as security, but this was held insufficient to show reasonable cause to believe. I do not wish to concur in this holding as a naked proposition. It would depend on all the surrounding circumstances and conditions.

In Tilt v. Citizens' Trust Co. (D. C.) 191 Fed. 441, affirmed 200 Fed. 410, 118 C. C. A. 562, 29 Am. Bankr. Rep. 906, the creditor took from the debtor, within the four-month period, a large part of its assets, and also practically all of its bills receivable, and hence left it crippled so far as money from collections was concerned, and stripped of substantially all its other assets. The court held that adequate inquiry was not made as to the solvency of the company, which it would seem was practically obvious. In this case the evidence discloses that the agents of the Sulzberger Company made careful inquiry of the debtor, and also outside. It was represented to them that no other creditors, unless it was one, was pressing for payment, that the assets were about double the liabilities, and that they could pay up in a year from the business. The agents watched the business, and the market seemed to be doing a good and an extensive business. There was no concession of insolvency or of inability to pay in cash from the profits of the business if given time, and the mortgage shows the credit was extended a year. The question in the case now before this court is: Did the Sulzberger & Sons Company of America, acting by its agents in this matter, receive this mortgage under such circumstances and with such information and knowledge (actual or imputed) as naturally would have caused the ordinary business person of intelligence and reasonable prudence, had he been the creditor receiving it, to have believed that thereby a preference would be effected? All the acts and conduct and transactions connected with the taking of the mortgage and all the knowledge gained must be considered as a whole, and not each occurrence and item of information by itself. After repeated readings of the evidence, I am unable to concur with the ultimate findings and conclusions of the learned referee. The referee has not found that adequate inquiry was not made, and I cannot so find.

Considering all the proved facts and circumstances and all the information obtained by the representatives of the Sulzberger Company, I find that that company and its agents did not think the now bankrupt company insolvent, but, on the other hand, honestly believed it solvent, and did not have reasonable cause to believe it insolvent, or that the taking of the security would operate as a preference. In my opinion the evidence does not sustain a finding to the contrary. The order of the referee, disallowing the claim of George C. Woodworth as a secured claim, is therefore reversed, and the claim will be allowed as a secured claim.

So ordered.