BASSETT v. EVANS et al. (two cases).

In re PHILLIP'S.

(Circuit Court of Appeals, Eighth Circuit. October 14, 1918.)

Nos. 192, 4991.

1. BANKRUPTCY ☞440—REVIEW—MODES.
    Where review of the facts in a proceeding to set aside a mortgage as a preference is sought, appeal is the proper remedy, and a petition to revise should be dismissed.

2. BANKRUPTCY ☞166(4)—"PREFERENCE."
    A mortgage given by a bankrupt to secure certain creditors held preferential, within Bankruptcy Act, § 60 (Comp. St. 1916, § 9644); the circumstances being sufficient to charge the creditors with reasonable notice they were securing a preference.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Preference.]

3. BANKRUPTCY ☞166(4)—PREFERENCES—NOTICE.
    Actual knowledge or belief of an intent to prefer is not necessary to render a transaction open to attack under Bankruptcy Act, § 60 (Comp. St. 1916, § 9644), as preferential, nor is a mere suspicion of a preference enough to invalidate; but the rule applicable to negotiable paper should not be applied, and instead "what is reasonable cause to believe," etc., must depend on the facts of each case.

4. BANKRUPTCY ☞166(4)—"REASONABLE CAUSE TO BELIEVE."
    "Reasonable cause to believe," under the Bankruptcy Act, covers substantially the same field as "notice," under the equitable doctrine of good-faith purchaser.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Reasonable Cause.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the District of Kansas.

Petition to Revise Order of the District Court of the United States for the District of Kansas.

In the matter of the bankruptcy of Dave Phillips. Petition by George R. Bassett, trustee in bankruptcy, against Ferd Evans and others to set aside a mortgage as a preference. From a decree denying the petition, the trustee appeals, and also petitions to revise. Petition to revise dismissed, and decree reversed.

E. L. Foulke, of Wichita, Kan. (Jesse D. Wall, of Wichita, Kan., on the brief), for appellant and petitioner.

George Gardner, of Wichita, Kan. (T. A. Noftzger and George W. Cox, both of Wichita, Kan., on the brief), for appellees and respondents.

Before HOOK and CARLAND, Circuit Judges, and AMIDON, District Judge.

AMIDON, District Judge. [1] This was a proceeding brought by Bassett, as trustee in bankruptcy of Dave Phillips, to set aside a mortgage as a preference. The referee and the trial court denied the petition and sustained the mortgage. The trustee brings the case into this court both by petition and appeal. As he seeks a review of the facts, appeal is the proper remedy, and the petition is dismissed.

[2] The controlling facts are as follows:

In 1910 Phillips, the bankrupt, purchased a stock of drugs and fixtures at Coldwater, Kan., for $4,000, all of which was secured by a chattel mortgage back on the property. He ran the business until January, 1913, when he had reduced the mortgage debt to $1,800, but had built up a large indebtedness to the trade. His principal creditors were C. E. Potts Drug Company, $2,271.26, the Southwestern Drug Company, $533.11, and C. A. Tanner & Co., $838.87. These concerns were wholesalers at Wichita who had acted together for many years in matters affecting retail merchants. In January, 1913, they felt dissatisfied with Phillips' condition, and sent Mr. Wintle, credit manager of the Potts Drug Company, to Coldwater to make an investigation. He not only talked with Phillips personally, but made a careful examination of his books, and ascertained the course and state of his business, and what he was owing to other creditors. What he ascertained is, in our judgment, indicated fully as well by what he did as by what he says he discovered. He took notes for the Potts Drug Company account for $200 each, payable monthly, and for the other accounts notes for $100 each, payable at like periods. The accounts were closed, and a new arrangement made by which Phillips, instead of having the usual commercial credit, was required to settle by cash for all new goods supplied him by these parties twice a month, and certainly not to exceed 30 days. Phillips went forward with his business. At the end of the year he had paid on the notes, so that the indebtedness stood C. E. Potts Drug Company, $1,490.40; Southwestern Drug Company, $347.62; C. A. Tanner & Co., $521.16. It is manifest, therefore, that he was badly in de-

fault on his notes. During this time he kited checks in paying debts for new purchases, and allowed some of them to go to protest, but finally made them good. At the close of the year 1913, Phillips had made no further payment on the purchase-price mortgage on his stock. He owed unsecured debts, in addition to what he was owing appellees, amounting to $2,731.80. He must have known that he was near the road's end.

Early in January, 1914, he agreed with one Dykes to exchange his stock and fixtures for a lot and store building valued for purposes of the trade at $6,000, Dykes to pay the boot in cash. To these negotiations appellees were parties, and, we think, were fully informed. They canvassed the whole transaction with Dykes personally, and discussed it by phone with Phillips. Notes for the amounts due them, and a mortgage upon the store property which Dykes was to deed to Phillips in the trade, were prepared by counsel for appellees, and delivered to Mr. Fisher, an employé of the Potts Drug Company, to take to Coldwater for execution by Phillips. Fisher had talked with Dykes about the property, and was employed by him as his representative in taking an inventory of the stock of drugs. He was engaged in that work for about three days. When the inventory was completed, and before it was footed up, he had Phillips sign the notes and mortgage, and sent them to appellees. The footings of the inventory showed the stock to be worth $7,475. This was $325 less than the $6,000 at which the store building was valued, and the $1,800 which was still due on the mortgage for the purchase price against the stock. Dykes was to have a clear title. He had only $1,000 cash to put into the deal. The Potts Drug Company loaned him $500 with which to make up the sum needed to pay off the mortgage on the stock. The holders of the mortgage accepted Dykes' note for $325 for the balance.

Appellees insist that at the time they accepted the notes and mortgage they believed that Phillips would get enough in the trade to pay all other creditors. They were very careful, however, not to wait for the inventory to be footed up, so they could ascertain as a fact whether this would prove to be the case. Notwithstanding their testimony, we do not believe they really entertained any such expectation. They themselves loaned Dykes $500 with which to pay off the mortgage. Their man, Fisher, had participated in making the inventory. He had a very good chance, as the result of that work, to make a close estimate as to what the stock would foot up, and, although he was not appellees' employé for purposes of taking the inventory, the knowledge which he acquired in view of the fact that he held the notes and mortgage as their agent, and was sent to Coldwater to close up the deal by taking the notes and mortgage, can fairly be imputed to appellees. It is also true that appellees must have been thoroughly familiar with Phillips' business during the year 1913. They were urging him all the time to pay his notes and to take care of his protested checks. Their traveling salesman visited his place of business twice a month to collect for current sales. Through Mr. Wintle, their credit man, they had carefully canvassed Mr. Phillips' situation at

the time the first notes were taken. It is likewise true that the mortgage here involved covered all of Phillips' property except such as was already encumbered for its full value. It covered all that Phillips received in exchange for his stock of drugs. If the mortgage had been taken on the stock of drugs direct, its preferential character would have been plain. What difference can it make that the mortgage was taken on the property which Phillips received in exchange for his stock?

From all the facts we think the conclusion is inevitable that they had reasonable cause to believe that Phillips was insolvent, and that the taking of the notes and mortgage would result in a preference to themselves over the other unsecured creditors. If they did not actually know the facts, the evidence leaves no doubt that they willfully abstained from getting the knowledge until after the notes and mortgage were executed and delivered to them. A circumstance occurred a few days later which throws a strong backward light upon the frame of mind of appellees at the time the mortgage and notes were taken. The Potts Drug Company wrote a letter to Phillips, urging him to move into the store building, so that he could claim it as a homestead. This would not only put the building beyond the reach of creditors, but it would likewise put appellees in a place where the other creditors could not complain, because their mortgage was taken upon exempt property. Reluctant as we are to disturb a finding concurred in by a referee and the trial court, we feel constrained to hold that the mortgage constitutes a voidable preference and ought to have been set aside. Courts must hold parties standing in the position which appellees occupied to have "reasonable cause to believe" what sensible business men standing in their place and possessing their knowledge would have believed. When such a standard is applied to appellees, we think the conclusion is too strong for any reasonable doubt.

The observations of Judge Hook in Pittsburgh Plate Glass Co. v. Edwards, 148 Fed. 377, 78 C. C. A. 191, are equally applicable to the mortgagee here:

"An examination of the record impresses us with the belief that the appellant's attorney was so well satisfied of the bankrupt's insolvency and its effect upon the mortgage he was about to take that he purposely traveled as close to the edge of actual knowledge as he could without obtaining it."

[3] The authorities tell us that section 60 of the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 562 [Comp. St. 1916, § 9644]) does not, on the one hand, require actual knowledge or actual belief of an intent to prefer (In re Eggert, 102 Fed. 735, 43 C. C. A. 1; In re Virginia Hardwood Mfg. Co. [D. C.] 139 Fed. 209); and, on the other hand, that mere fear or suspicion of a preference will not invalidate a transfer (Powell v. Gate City Bank, 178 Fed. 609, 102 C. C. A. 55). Thus between actual knowledge and actual belief, on the one side, and fear and suspicion, on the other, lies the "reasonable cause to believe" mentioned in the section. This classification, however, is not as helpful in the decision of a concrete case as it appears. Fear and suspicion of insolvency, if they be strong enough, become belief, and the

difficulty with the classification is that there are no criteria by which it can be said that one set of facts ought to engender fear or suspicion only, while another set of facts furnish reasonable cause for belief. It is impossible to group the ever-changing facts of business life into hard and fast categories, and say that one category produces fear, another suspicion, and another belief. Again, the rule of negotiable paper, that facts which arouse suspicion will not defeat the title of a holder (Hotchkiss v. Bank, 21 Wall. 354, 22 L. Ed. 645; Clark v. Evans, 66 Fed. 263, 13 C. C. A. 433), ought not to be applied to a question of preference because that rule "was framed in order to encourage the free circulation of negotiable paper" (Goodman v. Simonds, 20 How. 343, 356, 15 L. Ed. 934), and has no proper application to transfers of property. "Reasonable cause to believe," under section 60 of the Bankruptcy Act, covers substantially the same field as "notice" in determining whether a person is a bona fide purchaser of property. Both relate to transfers of property rather than negotiable paper. Hence, under section 60, the same as in the equitable doctrine of good-faith purchaser, "notice of facts which would incite a person of reasonable prudence to an inquiry under similar circumstances, is notice of all the facts which a reasonably diligent inquiry would develop." Coder v. McPherson, 152 Fed. 951, 82 C. C. A. 99; Grandison v. National Bank of Commerce, 231 Fed. 800, 809, 145 C. C. A. 620.

[4] What constitutes "reasonable cause to believe" under this section is a pure question of fact, and each case is best disposed of by an independent consideration of its own facts. What the statute requires is that the facts and circumstances known to the purchaser shall be ascertained, and then the question answered whether those facts and circumstances would have caused an intelligent business man to believe that a preference was intended, or would have put such a man upon an inquiry that would have discovered the true character of the transaction. If such be the case, the transfer is void. Otherwise it is valid.

We think the mortgage here involved was void, and should have been set aside. The decree below is reversed.