### BOONE v. MERCHANTS' & FARMERS' BANK et al.

#### In re PILAND.

(District Court, E. D. North Carolina. September 30, 1922.)

No. 445.

1. Bankruptcy ⊜➾303(3)—Evidence held insufficient to establish voidable preference.

Evidence *held* insufficient to sustain the burden resting on a trustee to show that, at the time of the execution or recording of a trust deed given by bankrupt in favor of a bank, officers of the bank who acted for it had reasonable cause to believe that the debtor was insolvent, or that enforcement of the security would effect a preference.

2. Bankruptcy ⊜➾172—Trust deed to bank, probated before stockholder as notary, held invalid as against trustee.

Under the settled law of North Carolina, that a notary public in taking acknowledgment of a deed and making privy examination of the maker's wife, is performing a judicial function, and that if he is an interested party he is disqualified and the probate a nullity, a trust deed executed by bankrupt and his wife in favor of a bank and probated before a notary, who was a stockholder and assistant cashier of the bank, *held* invalid as against bankrupt's trustee.

In Equity. Suit by W. D. Boone, trustee in bankruptcy of J. J. Piland, against the Merchants' & Farmers' Bank and W. P. Shaw, trustee. Decree for complainant.

Stanley Winborne, of Murfreesboro, N. C., for plaintiff.
Hicks & Son, of Henderson, N. C., for defendants.

CONNOR, District Judge. The bill, answer, and evidence disclose the following case:

J. J. Piland, 58 years of age, engaged in farming, residing on his farm, about 6 miles from the village of Winton, N. C., purchased a

stock of goods from a merchant, and with his son-in-law, W. H. Lassiter, began business in Winton, under the firm name of J. J. Piland & Co. Lassiter kept the books and attended to the business, which appeared to be prosperous until the fall and winter of 1920. The firm kept its account and did its banking with defendant, Merchants' & Farmers' Bank of Winton. During the year 1920 notes aggregating $5,500 (less $316), were executed by J. J. Piland and the firm of J. J. Piland & Co. to the bank, all of which were due January 27, 1921.

On or about January 27, 1921, John E. Vann, one of the directors of the bank, requested Piland to go to the bank, where he met defendant, W. P. Shaw, then vice president, and J. P. Mitchell, cashier. Piland says:

"They asked me to secure the notes—said, if I would take over the business in my name, they would advance the money to pay the debts of the firm; that if I would get my partner out of the business they would help me pay the unsecured claims. Had been doing all my business at the Merchants' & Farmers' Bank, and the bank was in a position to know my condition. Mr. Mitchell knew, when I had conversation with him, that a great many notes were past due, and it was after that I executed the deed of trust; said they would keep the same and not record it. It was my understanding that deed was not to go on record, and that they would let me have money to take up unsecured accounts. I thought in January and March, 1921, when I gave the deed of trust, that I was solvent, and I did not know until the 1st of April what my condition in the store debts was.

"When I made the mortgage, I thought the store debts were about $1,500 or more. I can't identify statements shown, but the one I made was written. It was some time after this statement that I learned that the store owed so much money. The money they loaned they said was to keep off the market, and I told them all I thought I owed. After I found out the large amount of indebtedness, I did not ask the bank for money to pay the same; but when I took [gave] the mortgage the bank told me that they would give me $10,000 to pay unsecured claims. Mr. Mitchell told me to dispense with Lassiter, my partner. My relation in store was clerking. and books of the store were given up entirely to Lassiter. At the time I executed the deed in trust, I knew that my debts amounted to over $11,000. The bank officials said that they would write the deed of trust, and it would not cost me one cent, and they could take it to my wife and have her execute the same. I knew nothing about my business. Lassiter attended to it. At the time I gave the deed in trust, I asked the bank officials not to put it on the record; that if they did so my creditors would press me. They promised not to record it."

It appears that, early in April, 1921, Piland secured from Lassiter a list of creditors and amounts due the firm, aggregating $6,288.86 (filed and marked Exhibit A). W. P. Shaw went to Richmond and Piland to Norfolk, for the purpose of making arrangements with creditors, when they found that the debts of the firm amounted to a very much larger amount than Lassiter had stated—some $16,000. Piland says:

"I thought the statement was correct." (Lassiter turned the business over to Piland April 9, 1921, at same time he went to Norfolk.) "I refused to go into bankruptcy."

Piland owned, January 1, 1921, several tracts of land and town lots, assessed for taxation at $24,600. Bank held mortgage on one tract for $2,500, assessed at $8,000. It seems that, after Piland returned from Norfolk and Shaw from Richmond, where they had learned the amount

of indebtedness, a proposition was made by some of the creditors, or some one representing them, that Piland execute a general assignment for the benefit of all of his creditors and that the bank would cancel the deed in trust. The assignment was executed on May 21, 1921, but the directors of the bank refused to cancel the deed, and the creditors filed a petition in involuntary bankruptcy against Piland. He was adjudged bankrupt June 7, 1921.

J. P. Mitchell says:

That he was cashier of defendant bank when the deed in trust was executed—had been for 19 years; had known Piland from boyhood, regarded him as a man of his word, of honor; looked after the deed. A few checks of Piland had come to the bank, for which he had not sufficient funds; took them up later. Knew that his son-in-law, Lassiter, had charge of the business. He appeared to be a competent man. Had a talk with him before the deed was made about the business. He said that the accounts due the store amounted to $12,000 or $14,000; debts. $6,000. Piland then owed the bank $5,500, for which it had no security; thought that he was good. "When he gave the deed in trust, I thought that he had property sufficient to pay all of his debts. Had let him have money without security during 1920; one of his notes indorsed by W. P. Shaw. I do not know what he did with the money loaned him.; do not know that he was being pressed by small creditors. When Piland executed deed in trust, he asked us not to record it; said that he was afraid that, if we did so, his creditors would press him. I told him that I would hold it off—did not name any time. I heard that Lassiter wanted to put Piland into bankruptcy—no one else. I kept hearing it, and did not know what they would do. This was before I had the mortgage recorded. It was my intention and purpose to advance the money to pay his debts. Later on I heard that his debts were much larger than I thought. This was after the mortgage was recorded. When I heard that Lassiter wanted to put him into bankruptcy, I had the deed recorded. I did not hear a rumor that he was about to break. I thought he was solvent. Did not hear that any one was pushing him."

W. P. Shaw says:

"Am president of bank; was, at date deed was executed, vice president; wrote the deed; did not believe that the execution of the deed would give bank a preference over his other creditors; had no reasonable cause for such belief; found out in April that he owed $6,000, besides what he owed the bank. This list ($6,200) was given me when I went to Richmond between the 10th and 15th of April. I believed that this was all that he owed, and that if he could get time he could pay all of his debts. I regarded Piland as a truthful man. I still think so. If this had been all he owed, we would have financed him. Bank was able to do so. I thought stock was worth $10,000 to $12,000. I knew of decrease in value of land during 1920. I knew that he owed money. Checks would sometimes come in bank for which he did not have sufficient funds for the day. He would make them good. I did not know that he was being pressed by his creditors. I indorsed note for him early in 1920 to pay for a Delco plant. He did not ask me to indorse others. Do not remember discussing Piland's financial condition in bank. Bank wanted to concentrate its paper and get security. Piland and Mitchell had conversation about the loan of $316 and not putting the mortgage on record. Had not heard that one of his creditors was threatening to put him into bankruptcy. Knew January 27, 1921, that Piland owed money, and that it was reported around Winton that he was in precarious financial condition."

The trustee alleges that Piland was insolvent on January 27, 1921, the date of the deed, and that such insolvency continued until it was registered March 22, 1922; that the officers of the bank on both said dates either knew or had reasonable cause to believe the existence of

such insolvency; that the deed in trust was intended by Piland to give a preference to the bank, and that its officers intended, by taking the deed, to secure by such preference a larger percentage of its debt than other creditors of the same class would receive upon a sale of his property. Defendants deny that the bank officers knew, or had reasonable cause to believe, on January 27 or March 22, 1922, that Piland was insolvent, or that the deed would operate as a preference.

The allegation that Piland was insolvent, within the meaning of the Bankruptcy Act (Comp. St. §§ 9585–9656), on January 27, 1921, is sustained by the evidence. It is not, however, clear that either he, or the officers of the bank, at that time, knew of his insolvency. He says, and is corroborated in his statement, and not contradicted, that the mercantile business of J. J. Piland & Co. was conducted by his son-in-law, Lassiter, who lived in the town of Winton, kept the books, contracted the debts, and that he (Piland) lived on his farm 6 miles away; that his occupation was farming, and had been so at all times during his life. This is manifestly true. This situation is similar to that of many other men, who, having lived upon and operated their farms with success, accumulated some money and established credit, during the years immediately following the war, when the impression prevailed that mercantile and every other character of business was successful and yielding large profits; having a son-in-law, who probably had some business experience, he purchased a stock of goods and "set him up in business."

It is well known that farming, mercantile, and almost every character of business at that time yielded profits far beyond the most sanguine expectations. Prices of cotton, tobacco, and all other farm products were high, and general prosperity pervaded the land. This was especially true in Eastern North Carolina. Land values, as shown by sales and assessment for taxation, were unprecedentedly high. That Piland was regarded as amply solvent is shown by the assessed value of his land and the fact that he borrowed money from the bank without security, other than one note in the early part of 1920, when the vice president indorsed for him. It is so well known that no proof was necessary that the crop of 1920 was planted and cultivated on a basis of cotton at 40 cents and tobacco at 50 cents a pound; those prices prevailing during the winter and spring of 1919–1920. The drop in prices began in the summer and fall of 1920. The extent of its effect upon values and collections, by merchants who had extended liberal credit on the crops, was not understood or appreciated until later, in the fall of 1920 and early winter of 1921. Piland was in a condition similar to many of the best farmers and business men of his section. That Lassiter was hopeful of making collections and going on in business is evident, and that he concealed from his father-in-law the extent and amount of the liabilities is also clear. A typewritten statement was given by him to Piland and introduced on the hearing purporting to show names and amounts of creditors, aggregating $6,288.26.

It appears from the evidence that the stock of merchandise inventoried over $6,000. The amount of accounts receivable was, as was

to be expected, large—too large, for a safe business; but the same condition is found in many cases in bankruptcy of merchants under similar conditions in this district. The large amounts due for fertilizers, goods, and supplies, advanced to farmers during the disastrous year of 1920, explains the bankruptcy of a large majority of merchants conducting a "time business."

It was doubtless this condition, known to the officers of the bank, which caused them to wish Piland's notes "concentrated" and secured, without attributing to them on January 27, 1921, any belief that he was insolvent. They doubtless anticipated that the bank would be called upon to extend the time for payment beyond the spring of that year. The land conveyed in the deed was assessed for taxation at more than double the debt. The fact that Piland requested, and the cashier assented, that the deed should not be recorded, because to do so "would cause his creditors to push him," indicates a fear on the part of both that, if "pushed," he might not be able to pay his debts in full is evidence tending to show that, if called upon at once, he was not able to pay all of his debts.

Light is thrown upon this request by the fact that there was some understanding that the bank would advance money to enable Piland to settle his debts. Shaw and he went to Richmond and Norfolk on April 9th, for the purpose of making some arrangement with the creditors, when they learned that the firm owed an amount more than double than that stated by Lassiter. It seems that, at the suggestion of Shaw, Piland took active charge of the business at some time prior to going to Norfolk. Lassiter is not introduced by either party, making the impression in the light of other evidence that an estrangement had taken place between him and Piland, which would seem a natural result of his conduct. In the light of these facts, about which there is no substantial controversy, I am unable to find that Piland knew of his insolvency when he executed the deed, or that the bank officers either knew or had reasonable cause to believe, at that time, that he was insolvent, or that either of them intended or expected to give or secure a preference.

[1] We are thus brought to an examination of the more serious and doubtful question whether the officers of the bank had such knowledge or reasonable cause for belief, on March 22, 1921, when the deed was registered. Two months elapsed between the execution and registration of the deed. During this period there was no change in his condition—that is, the amount of his indebtedness—nor, so far as appears, the assets of the firm. General business conditions had not improved; the extent of the disastrous "slump" in value of property and difficulty in making collections had become more generally known and its effect upon business appreciated. Piland says that the business was turned over to him April 9th; that is, as I understand, Lassiter retired and he took charge.

The essential elements of a voidable preference, as defined by the statute, are: Making a transfer of his property, by a person indebted and, at the time of making such transfer, so insolvent that the effect of the enforcement of such transfer will be to enable the creditor for whose

benefit it is made, to obtain a greater percentage of his debt than other creditors of the same class. In fixing the four-months period, time is to be counted from the date of the registration of such transfer, if registration is required. If the foregoing elements are found, and it further appears that, at the time of the transfer, or registration of such transfer, if such registration is required, and being four months before filing the petition or adjudication, the person to be benefited thereby, or his agent acting therein, shall then have reasonable cause to believe that the enforcement of such transfer would effect a preference, it shall be voidable by the trustee, etc. Bankruptcy Act, § 60 (a), (b); Collier on Bankruptcy (11th Ed.) 861.

The case, then, comes to this: Did the officers of the bank—that is, the cashier, who caused the deed to be registered, March 22, 1921—have reasonable cause to believe that Piland was then insolvent and that the enforcement of the security would operate as a preference within the meaning of the act. Mr. Mitchell, the cashier, a man of integrity and intelligence, examined before me, says:

"When I heard that Lassiter wanted to put him into bankruptcy, I had the mortgage recorded. I did not hear a man say that he was about to break. I thought that he was solvent. Did not hear that any one was pushing him. First knew his debts to be in excess of amount he represented late in spring, when I found that he owed me more than he told me in January. The deed was withheld from registration because Piland said it might hurt his credit. Later it was recorded; got to talking so much about bankruptcy that I thought it best to go on record. If we had thought he was 'busted,' we would have put it on immediately after we got it."

Regarding the agreement not to register deed, Piland says:

"They said they would keep same and not record it, and put it on record if anything happened. * * * They said that they would keep same off and not put on record, and pay unsecured debts. It was my understanding that the deed was not to go on record, and that they would let me have money to take up unsecured debts."

While in Coder v. Arts (8th Circuit) 152 Fed. 943, 82 C. C. A. 91, 15 L. R. A. (N. S.) 372, the amount involved is much larger than here, there is a similarity of the facts disclosed in the instant case. There Armstrong was engaged in farming. Arts was engaged in banking, and had loaned the former money at different times, upon which he owed a balance, a part of which was due. He had the reputation of being a wealthy man, owning real estate of large value, some of which was covered by mortgage. Arts being sick, the cashier, upon examining the loans to Armstrong, telephoned him to come to the bank. The cashier and a son of Arts explained to him that they wished to have security and the reasons stated—the amount of the loan as compared to the stock of the bank. Armstrong in four or five days executed a mortgage. He was, at the time, in fact insolvent, and knew it, but did not inform the cashier. The mortgage was recorded at once, with the request to the register not to put it on a book kept for the information of the newspapers, not a legal register. At the time Armstrong was overdrawn $2,000, for which no security was taken. Armstrong filed a petition in bankruptcy within four months. The mortgage was attacked by the trustee as being a voidable preference. Arts and his son

testified that they did not know and had no reasonable cause to believe that Armstrong was insolvent. There was testimony, which was denied by Arts, that he was told by several persons prior to the execution of the mortgage that Armstrong was insolvent. The District Judge (145 Fed. 202), after discussing the evidence, reached the conclusion that the agent of the mortgagee did not have reasonable cause to believe that Armstrong was insolvent. He reviews the decisions of the federal courts at length. The Circuit Court affirmed the judgment. This judgment was affirmed, 213 U. S. 223, 240, 29 Sup. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008.

In Grant v. Bank, 97 U. S. 80, 24 L. Ed. 971, the court, construing the language found in the act of 1867, in respect to voidable preference, says:

"Some confusion exists in the cases as to the meaning of the phrase 'having reasonable cause to believe such a person is insolvent.' Dicta are not wanting which assume that it has the same meaning as if it read 'having reasonable cause to suspect such a person is insolvent.' But the two phrases are distinct in meaning and effect. It is not enough that a creditor has some cause to suspect the insolvency of his debtor, but he must have such a knowledge of facts as to induce a reasonable belief of his debtor's insolvency, in order to invalidate a security taken for his debt. To make mere suspicion a ground of nullity in such a case would render the business transactions of the community altogether too insecure. It was never the intention of the framers of the act to establish any such rule. A man may have many grounds of suspicion that his debtor is in failing circumstances, and yet have no cause for a well-founded belief of the fact. He may be unwilling to trust him further; he may feel anxious about his claim, and have a strong desire to secure it; and yet such belief as the act requires may be wanting. * * * The debtor is often buoyed up by the hope of being able to get through with his difficulties long after his case is in fact desperate; and his creditors, if they know anything of his embarrassments, either participate in the same feeling, or at least are willing to think that there is a possibility of his succeeding. To overhaul and set aside all his transactions with his creditors, made under such circumstances, because there may exist some grounds of suspicion of his inability to carry himself through, would make the bankrupt law an engine of oppression and injustice."

In that case it appeared that the bankrupt had borrowed money frequently from the bank; been compelled to renew his notes; overdrew his account; somewhat reckless in his manner of doing business; seemed pressed for money; was actually insolvent when the trust deed was executed; was largely indebted in a distant county; the officers had no knowledge of this indebtedness. The learned justice said that these facts established grounds for suspicion on the part of the officers of the bank, "but falls far short of establishing that they had reasonable cause to believe that he was insolvent." The case was cited with approval in Stucky v. Masonic Savings Bank, 108 U. S. 74, 2 Sup. Ct. 219, 27 L. Ed. 640.

In City National Bank v. Slocum (C. C. A. 6th Cir.) 272 Fed. 11, 22, Denison, Circuit Judge, says:

"When the present Bankruptcy Law * * * was enacted, the phrase 'reasonable cause to believe,' in this very connection, had been judicially determined to mean, not mere suspicion, but 'such knowledge of the facts as to induce a reasonable belief.' * * * That definition follows the phrase into

this act; and it has been so construed and applied by this court"—citing Grant v. Bank, supra, and other cases cited.

While, as in other cases, there is not a perfect analogy, the principle upon which the conclusion is reached is the same as in the instant case. In Gaylord's Case (D. C.) 225 Fed. 234, the judge finds that the mortgagee creditor believed the debtor to be solvent at the time the mortgage was executed; he did not demand the execution of the mortgage; it was suggested by the debtor, but neither party had bankruptcy in mind. He says:

"However, it is evident that both parties knew that, if payment on all hands by all creditors was pressed, bankruptcy might ensue, and that in such event the enforcement of the mortgage would work a preference; that is, enable it to obtain a greater percentage of its debt than any other of the creditors of * * * the same class. It must be conceded that every creditor of a person or firm who takes security from his creditor for a past due indebtedness, by way of chattel mortgage,, knows that its enforcement will work a preference if insolvency then exists, and bankruptcy follows. But this is not enough to avoid the transfer. The creditor must have reasonable cause to believe, etc. The words * * * not only refer to the time when the transfer was made—that is, when the mortgage is given—but mean that the creditor taking it must then have had reasonable cause to believe that the then financial condition of the creditor was such that the enforcement of the security would work a preference as between the then existing creditors of the same class."

Judge Ray, in Smith v. Powers (D. C.) 255 Fed. 582, again discussing the meaning of the provisions of section 60b of the act, repeated the principle applied by him in the Gaylord Case, saying:

"Reasonable cause to believe is not a mere suspicion or surmise, but knowledge at the time of facts of a nature or character calculated to induce a belief in the minds of an ordinarily intelligent and prudent man that the payments made would work and effect a preference; that is, facts calculated to induce a belief that the person or corporation making them was insolvent within the meaning of the law, owing debts he or it was unable to pay in full and that he, the person securing the payments or payment made, was getting his pay in full * * * when others of the same class would only receive a part of their just claims. A person has reasonable cause to believe when such a state of facts is brought to his notice and attention respecting the affairs and pecuniary condition of his debtor as would lead a prudent business man of intelligence to the conclusion that the debtor was then insolvent, and that the payment then made * * * would, if retained, operate to give him a greater percentage of his. debt, than other creditors of the same class would receive."

Sumner v. Parr (D. C. N. Y.) 270 Fed. 675, is an illustrative case. There Judge Hand, who has had large experience in such cases, discussing the facts upon which the conclusion as to whether the creditor, taking security from his debtor, which was attacked by the trustee, as in the instant case, says:

The only question left open is of the defendant's knowledge that the transfer would result in giving him a preference. "He knew that the bankrupt had been doing a prosperous business, and had had very substantial, if not large, interests in real property. He knew that she had been slow in her payments for some time, and that he had been obliged to take notes from her, first for $500, and finally, in the autumn of 1917, for $1,000. He necessarily knew, as he had repeatedly asked her to pay up, that she did not have enough ready money to do so. In other words, he knew that she was getting in an

embarrassed financial condition. In taking notes, he said his chief purpose was not to have so much money outstanding without interest, and this was undoubtedly so; but in taking security he was certainly actuated by suspicion of the continued sufficiency of his debtor's circumstances. He knew also that her total indebtedness amounted to some $6,000 or $7,000; in fact, it probably was $2,000 or $3,000 greater than this; but there is no evidence that he knew of any more, and, as she had told him what the facts were, I think he might reasonably have rested without further enquiry."

After discussing the evidence in regard to the assets of the bankrupt, the learned judge concludes:

"Finding his debtor unable to make ready payments, and knowing that she had substantial property, he became suspicious, and dissatisfied with the delays, and took security. If this charges him with knowledge that the security will create a preference, then so is every creditor who takes security because he has become doubtful and suspicious of the eventual insolvency of his debtor. When the statute requires belief that a preference will result, it means more than this." Pyle v. Texas Transport Co., 238 U. S. 90, 35 Sup. Ct. 667, 59 L. Ed. 1215; Barbour v. Priest, 103 U. S. 293, 26 L. Ed. 478.

In Bassett v. Evans, 253 Fed. 532, 535, 165 C. C. A. 202, 205, Judge Amidon, after stating the principle upon which cases are decided, says:

"Thus between actual knowledge and actual belief, on the one side, and fear and suspicion, on the other, lies 'the reasonable cause to believe' mentioned in the section. This classification, however, is not as helpful in the decision of a concrete case as it appears. Fear and suspicion of insolvency, if they be strong enough, become belief, and the difficulty with the classification is that there are no criteria by which it can be said that one set of facts ought to engender fear or suspicion only, while another set of facts furnish reasonable cause for belief. It is impossible to group the ever changing facts of business life into hard and fast categories, and say that one category produces fear, another suspicion, and another belief."

The definition of the word, as given in the Century Dictionary, may be called in aid in cases in which the evidence leaves the fact to be found in the realm of doubt:

"Belief—A conviction of the truth of a given proposition or an alleged fact resting upon grounds insufficient to constitute positive knowledge." "To believe—to be persuaded of the truth of anything."

What constitutes reasonable cause to believe, under this section, is a pure question of fact, and each case is best disposed of by an independent consideration of its own facts. What the statute requires is that the facts and circumstances known to the creditor shall be ascertained, and then the question answered whether those facts and circumstances would have caused an intelligent business man to believe that the enforcement of the transfer, the deed in trust, would enable the bank to receive a larger percentage of its debt than other creditors of Piland of the same class would receive. The question of Piland's intention is, since the Amendment of 1910 (36 Stat. 838), immaterial.

There is no evidence in this case contradicting Piland's sworn statement that, until he went to Norfolk and Shaw to Richmond, April 9, 1921, he believed the statement made to him by Lassiter, who kept the books and conducted the business, that the debts of the firm amounted to $6,288, was true. The testimony is all to the effect that Piland is

a man of integrity and good character. He made that impression upon me. He belongs to a type of men in Eastern North Carolina, many of whom have, without fault on their part, been financially ruined by conditions which they could not anticipate. He is not financially interested in the result of this suit. In any event, and by any result, he has lost his entire estate. Such equity as he has in the land conveyed, if the deed of trust is sustained, passes to his trustee in bankruptcy. He evidently had no thought of becoming a bankrupt in January, 1921. When he found in April, 1921, the extent of his debts, he says: "I refused to go into bankruptcy." He made every effort in his power to make a fair and honorable settlement with his creditors. Whatever may be the result of this suit, there can be no question of his honesty and good faith. At 60 years of age, his life spent in cultivating the soil, he is left without property or estate, save his homestead exemptions.

Passing to the consideration of the conduct of the other two parties to the transaction, the only evidence of Shaw's connection with it is that on January 27, 1921, being then vice president, when Piland went to the bank at Vann's request, he asked him to execute the deed in trust to secure the notes, extending the time of payment for one year. He says that the list of creditors and indebtedness was given him when he went to Richmond between the 10th and 15th of April, 1921.

"I believed that was all the money he owed, and that if he could get time he could pay all of his debts. I still think so. If this had been all he owed, we would have financed him. Bank was able to do so. I thought stock [of goods] worth $10,000 or $12,000. His financial condition had changed by reason of price of crops. I knew that he owed money. Checks would come in, and he would not have money to pay them—would make them good. I did not know that he was being pressed by his creditors. Bank wanted to concentrate its paper and get security."

I do not find in this testimony evidence of knowledge or reason to believe, by Shaw, that Piland was insolvent or unable, under fair or usual conditions, to pay his debts in full. In seeking to ascertain the state of mind or mental attitude of a person whose conduct is being examined, we must, so far as possible, put ourselves in his position and take our bearings from his surroundings. It has been well said by an eminent judge that the state of a man's mind is as essentially a fact as the state of his digestion—more difficult to ascertain, but none the less a fact. That a farmer or village merchant, did not have a balance to his credit to meet every check when presented, would create no serious apprehension in the mind of the cashier of a bank in a small town, especially if the balance was promptly made good.

It is well known that, by reason of the drop in the price of the staple crops during the fall and winter of 1920–21, collections were "slow" and business "depressed." Men not anticipating bankruptcy were compelled to ask indulgence, extension of credit, which as balance was promptly made good. The burden of proof is on the plaintiff trustee to show by a fair preponderance of all the evidence in the case the existence of the essential facts constituting a voidable preference, "and when inferences from proved facts are to be drawn, the rule ob-

tains that, if two inferences of substantially equal weight may reasonably be drawn from proved facts, then that inference shall prevail which sustains the transfer or security." In re Gaylord, supra.

It is important to note that, upon its value assessed for taxation, Piland's real estate, not included in the deed in trust to Shaw, was sufficient to pay all of the indebtedness of which either he or the officers of the bank had information, and, in addition thereto, the stock of goods, which inventoried about $6,000, and the credits of the partnership, were unincumbered. After careful and anxious consideration of the evidence, in regard to which there is but little controversy, in the light of the decisions of the courts, I am unable to find that the officers of the bank, either at the time of the execution or registration of the deed in trust to Shaw, had reasonable cause to believe that it would operate as a preference within the meaning of the Bankruptcy Act.

[2] The plaintiff attacks the deed in trust for that the acknowledgment of Piland and private examination of his wife were taken by P. S. Jenkins, a notary public who was, at the time of taking such probate, the owner of two shares of the capital stock and assistant cashier of defendant, the Merchants' & Farmers' Bank. This contention goes to the validity of the deed as against the plaintiff trustee in bankruptcy of Piland, who, for the purpose of this suit, is vested with all the rights, remedies, and powers of a judgment creditor holding an execution duly returned unsatisfied; that is, if a creditor whose judgment was duly docketed and thereby became a lien on the land could have attacked and invalidated the deed in trust, because it was put to registration upon an invalid probate, the trustee may do so. Bankruptcy Act, § 47, Amendment 1910 (Comp. St. § 9631).

Section 3293, Consol. Stat., confers upon notaries the power to take probate of deed. It has been uniformly held by the Supreme Court of North Carolina that taking probate of a deed is a judicial or, as sometimes said, a quasi judicial, act. Rodman, J., in Paul v. Carpenter, 70 N. C. 508, says:

"To take the acknowledgment and privy examination of a feme covert to a deed conveying her land is a judicial act."

In White v. Connelly, 105 N. C. 65, 11 S. E. 177, it was held that not only taking acknowledgment and probating a deed was a judicial act, but that when the statute conferred upon a justice of the peace or a notary public power to take acknowledgment and certify same to the clerk of the superior court, who adjudged such certificate to be in due form for the purpose of entitling it to registration, the clerk was performing a judicial act, and therefore, if a party to or interested in the property conveyed, disqualified.

While the well-considered and sustained opinion of Mr. Justice Clark rests the conclusion upon the language of the statute, disqualifying any clerk from acting in any proceeding, "if he or his wife is a party or a subscribing witness to any deed of conveyance" (Consolidated Statutes, § 939 [3]), he says that:

"If not disqualified by the statute, the general grant of power would be subject to the exception that no one can be judge in his own case."

285 F.—13

Quoting Blackstone, Com. 91, the learned justice says:

"This maxim applies in all cases where judicial functions are to be exercised, and excludes all who are interested, however remotely, from taking part in their exercise. It is not left to the discretion of the judge, or to his sense of decency, to decide whether he shall act or not. All his powers are subject to this absolute limitation, and when his own rights are in question he has no authority to determine the cause. Accordingly, when the Lord Chancellor, who was a shareholder in a company, in whose favor the Vice Chancellor had rendered a decree, affirmed this decree, the House of Lords reversed the decree on this ground, Lord Campbell observing: 'It is of the last importance that the maxim that no man is to be a judge in his own cause should be held sacred. And that is not to be confined to a cause in which he is a party, but applies to a cause in which he has an interest.'"

This decision has been repeatedly and uniformly approved by the court. In Long v. Crews, 113 N. C. 256, 18 S. E. 499, the same justice, writing for the court, says:

"In this state it is settled law that an acknowledgment of a deed by the husband and privy examination of the wife taken before a justice of the peace, commissioner or notary, is a judicial, or at least a quasi judicial, act, and if such officer is not authorized to take it, the probate upon it by the clerk and registration is invalid as against creditors and purchasers. * * * The same principle still applies where the officer taking the acknowledgment is disqualified, not (as above) by not acting within the authorized locality, but by reason of his interest in the deed, either as party, trustee, or cestui que trust."

In that case the notary taking the probate was a preferred creditor secured in the deed, and was held to be disqualified to act, and hence the probate "a nullity. It could not be cured by probate upon such acknowledgment before the clerk and registration"—citing a number of cases. Attorney General v. Knight, 169 N. C. 333, 85 S. E. 418, L. R. A. 1915F, 898, Ann. Cas. 1917D, 517.

It may be taken as settled law in this state, which constitutes the rule for the guidance of this court, that the notary, Jenkins, in taking the acknowledgment of the maker and privy examination of his wife, was performing a judicial function, and if, by reason of his relation to the bank to whom the note secured therein was payable, as a stockholder and assistant cashier, was interested in the purpose and object of the execution of the deed was disqualified to act.

It is conceded by counsel that no decision on "all fours" with the instant case is to be found in the North Carolina Reports. This condition of the law invites us into the field of decision found in other jurisdictions and authoritative text-books. Mr. Devlin, in his work on Deeds (section 477b, 3d Ed.), says:

"The general principle that interest will disqualify is well recognized when it comes to applying the rule to a stockholder of a corporation. While the decisions are not uniform, the general rule undoubtedly is that a stockholder has an interest in the corporation sufficient to disqualify him from taking an acknowledgment to a conveyance to which the corporation is a party, and an acknowledgment so taken is void."

For this statement of the law, the learned author cites in the note (1) a large number of cases, among them Hayes v. Southern Home L. & B. Asso., 124 Ala. 663, 26 South. 527, 82 Am. St. Rep. 216, in which Mr. Justice Sharpe says:

"The acknowledgment in question was taken by a notary who was a stockholder in the mortgage association, and as such under the plan of the association he was entitled to participate in the profits arising from loans and from other sources. He had therefore a substantial interest in upholding the attempted mortgage security which disqualified him to conduct or certify the separate examination and acknowledgment of Mrs. Hayes. * * * Upon these considerations it must be held that the acknowledgment to the mortgage is void, and that the mortgage itself is of no validity as a conveyance or security for the loan in question."

This case is approved in Jenkins v. Schwab, 138 Ala. 664, 35 South. 649; Stevenson v. Simmons, 49 N. C. 13, 26. The editor of Ruling Case Law (volume 1, § 41) says:

"It is not to be gainsaid that the decided weight of authority considering an officer acquiring a beneficial interest under an instrument to be so far incompetent as to render his act null and void. In some decisions the rule is said to rest upon broad grounds of public policy. Other decisions have found the reason for the rule in the probative force accorded to the officer's certificate. And some courts, declaring the officer's duties to be judicial, assert that he may not take an acknowledgment of a deed in which he is interested for the reason that no one may be a judge in his own case."

The author, after noting the cases which hold the probate valid, although taken by an officer or stockholder of the corporation interested, because the act is ministerial, and not judicial, expresses the opinion that, according to a correct rule, the validity of the probate in such cases should be made to depend upon the facts in each case in which the interest of the officer taking the probate should be regarded as casting suspicion upon the deed to be removed by rebutting evidence. This view was adopted by the Supreme Court of Tennessee in Cooper v. Hamilton B. & L. Asso., 97 Tenn. 285, 37 S. W. 12, 33 L. R. A. 338, 56 Am. St. Rep. 795. The notary who took the probate was a stockholder and director in the corporation and its attorney. The justice, writing for the court, says:

"There is quite a conflict of authority and diversity of holding in the different states upon the question whether the act of taking an acknowledgment to a deed or other instrument is a ministerial or judicial act."

He gives a list of the states holding the different views, putting North Carolina in the list of those holding that it is judicial. Following an interesting review of the history of legislation upon the subject, he says:

"Aside from the question whether the act is ministerial or judicial, or both, in its character, it is held, and properly so, that it is unwise and contrary to public policy for an officer to take an acknowledgment to any instrument to which he is a party, or in which he is interested directly or indirectly."

After reviewing the decisions of the court, the learned justice concludes:

"In accord with the principles involved in these cases, we think the better rule is that acknowledgments before parties related or interested are voidable, but not ipso facto void, * * * still they are open to attack, and the court will lend a ready ear to evidence of undue advantage, fraud, or oppression, arising out of the fact of such relationship or interest in the officer taking the acknowledgment."

This view has not been adopted by the Supreme Court of this state, nor does an examination of the decisions of other courts sustain it.

In Savings Bank v. Spencer, 26 Conn. 195, it is held that, where the statute requires that a deed conveying land shall be attested by two witnesses, it is intended that the witnesses shall be at the time disinterested, and that a stockholder in a corporation was incompetent as an attesting witness to a deed of the corporation. Hinman, J., says:

"We put the case [holding the deed invalid] upon the validity of the attestation by an interested witness, rather than upon the validity of the acknowledgment, because it is entirely decisive of the case. * * * A stockholder in a private corporation is interested in all its transactions, and of course in every conveyance to or from it. As the assets of the corporation are increased or diminished, his stock, which is the representative of a portion of the assets, is of more or less value."

In Kothe v. Krag-Reynolds Co., 20 Ind. App. 293, 50 N. E. 594, a mortgage to the corporation was probated before a notary who was a stockholder, director, and secretary of the corporation. The statute rendered him incompetent to act as a notary in the business of such corporation. The court said:

"The relations that an owner of stock and an officer of a corporation bear toward such corporation are such as ordinarily preclude him from acting as a notary public in taking an acknowledgment of a mortgage or other instrument which inures to the benefit of the corporation, and in our judgment this is just what the Legislature intended to prevent by the passage of the statute quoted."

In Wilson v. Griess, 64 Neb. 792, 90 N. W. 866, the notary, who took the acknowledgment of the mortgagor and his wife to a mortgage to the bank was assistant cashier, stockholder, and director of the bank. The court held the mortgage invalid. To the suggestion that the bank had but a small interest in the note secured by the mortgage, it is said:

"It is contended by the appellant that, because the interest of the First National Bank * * * in the note and mortgage in controversy was small, no such beneficial interest in a pecuniary way would accrue to Miller, the cashier, stockholder and director of said bank, as would render him disqualified, by reason thereof, to take the acknowledgment. We hold this is not a question of degree or amount of interest; that, if there was any beneficial interest in a pecuniary way which would accrue to Miller by reason of these transactions, he was disqualified from taking the acknowledgment to the mortgage in question."

The mortgage was held to be void as against creditors. Chadron L. & B. Ass'n v. O'Linn, 2 Neb. (Unof.) 246, 95 N. W. 368.

In Smith v. Clark, 100 Iowa, 605, 69 N. W. 1011, cited in the Griess Case, supra, the mortgage was made to a third party to secure a note due the bank of which the notary, who took the acknowledgment, was a stockholder. It was held that he was disqualified and the mortgage invalid.

"The disqualification of a notary, who is an officer and stockholder in a corporation, is not dependent on statute, but exists without regard to statutory regulation." 1 Devlin on Deeds, § 477d.

In Chadron v. L. & B. Ass'n, supra, it is said:

"Whilst, strictly speaking, a stockholder has no independent interest in the corporate property, as such, nevertheless his shares of stock entitle him to an aliquot part of the corporate property as his number of shares bears to the whole capital stock. If the corporate property is enhanced in value, the result is a corresponding increase in the value of its shares of stock, and vice versa in cases of loss. It seems to us logical and a necessary conclusion that a stockholder in a corporation has a beneficial interest in the corporation * * * depending on the number and value of the shares of stock held by him. The amount of the beneficial interest cannot be made a rule of law in determining whether a person is disqualified from acting as a notary in any given case."

After anxious and careful examination of the decisions of American courts, I am led to the conclusion that, taking the law to be as held in this state, taking probate of a deed is a judicial act, and that any person who has an interest in the land or the purpose for which the deed is executed, is disqualified. That by the great weight of authority a stockholder and officer of a corporation has such an interest as brings him within the principles upon which the disqualification rests.

While not conclusive upon the court, it appears that the Legislature of the state has recognized the law as held by the court. In chapter 1003, § 1, Public Laws of 1907 (section 3345, Con. Stat.), probates which have been taken before a clerk, notary public, justice of the peace, "who was at the time a stockholder or officer in any corporation, bank or other institution which was a party to such instrument, the certificates of such clerk, justice * * * or notary" are validated. This clearly refers to probates which have theretofore been taken. This act was ratified March 11, 1907.

By chapter 105, Pub. Laws Extra Session 1908, the act of 1907 was amended by striking out the word "seven" and inserting the word "eight." The section is thereupon repealed, and the following section substituted therefor:

"Sec. 3. That the proof and acknowledgment of deeds, mortgages, deeds of trust, * * * which have been made, taken by or before any notary public on or since March eleventh, 1907, are hereby in all respects declared valid and sufficient, notwithstanding the notary may have been interested as attorney, counsel or otherwise in said * * * deeds of trust," etc.

This act was ratified February 1, 1908, and re-enacted in Consol. Statutes, § 3344, which is in force from and after the 1st day of August, 1919. 2 Con. Stat. § 1090. The effect of this section was to validate such probates taken between March 11, 1907, and August 1, 1919. So, in chapter 41 of the Laws of 1913, section 3346, Consol. Statutes, is enacted, that probates taken prior to January 1, 1913, by stockholders and officers of building and loan associations of deeds and mortgages to such associations are validated.

So special acts validating probates taken by persons named, officers of corporations, to deeds and mortgages to such corporations, are validated. Chapter 744, Public Laws of 1909. By chapter 13, Public Laws of 1921, the probate of a deed executed to S. C. Gettys, justice, taken by him, is validated. These validating special acts show that the attention of the Legislature has repeatedly been called to the decisions

of the courts, and while validating the probates, void under these decisions, it did not change the law, by empowering either stockholders and such officers to take the probate of deeds in which the corporation was interested, or declaring that taking probate of deeds was, and should be, deemed a ministerial act.

It is held by some courts, and probably such is the weight of authority, based upon a sound policy, that when the disqualifying fact does not appear upon the face of the deed or certificate, its admission to registration protects purchasers who buy upon the faith of the validity of the probate, and that the deed is not open to collateral attack: Morrow v. Cole, 58 N. J. Eq. 203, 42 Atl. 673, is authority for this view. Complainant held a first mortgage, which he sought to foreclose. He also held a judgment, which constituted a lien subsequent to the mortgage, but prior to the judgment the mortgagor executed a second mortgage on the same real estate to one of the executors of a testator, which was acknowledged before another one of the executors and recorded. The complainant contended that the judgment, although subsequent to the registration of the second mortgage, was a prior lien because of the acknowledgment of the execution of the mortgage before one of the executors. The Vice Chancellor, citing cases in which it was held that the probate of a deed was a judicial act, says that:

"The contention is unsound. The act is no more judicial than ministerial. * * * Both reason and authority concur in declaring when the interest of the acknowledging officer does not appear on the face of the deed that the acknowledgment is not void, and that the registry of the deed is notice"— citing the opinion of Chief Justice Waite in National Bank of Fredericksburg v. Conway, 17 Fed. Cas. 1203, that "it is against the policy of the recording acts to hold an acknowledgment void because of the secret interest of an officer taking and certifying it."

The Chief Justice held the probate to be a ministerial act and the record notice. Herein is seen the line of cleavage in the decisions of American courts.

In Babbitt v. Bent County Bank, 50 Colo. 258, 108 Pac. 1003, the execution of a chattel mortgage executed to the bank was acknowledged before a notary who was cashier, director, and stockholder of the bank. In a controversy between a subsequently acquired lienor, the court said:

"The taking of this acknowledgment, unlike that of a married woman when separate examination is required, is purely ministerial. The alleged infirmity is a matter outside the record, that may not be taken advantage of except for fraud."

In Blanton v. Bostic, 126 N. C. 418, 35 S. E. 1035, it was held; the present Chief Justice writing the opinion, in a controversy between one claiming under a mortgage, the probate to which was taken by a person disqualified, by reason of interest, but whose disqualification did not appear on the record, and a subsequent purchaser for value and without notice of the disqualifying fact, that:

"If the disqualification of either the probating or acknowledging officer appears upon the face of the record, the registration is a nullity as to subsequent purchasers and incumbrances. * * * But when the incapacity of the acknowledging or probating officer is latent; i. e., does not appear upon the record, one who takes under the grantor in such instrument gets a good title."

It was held, however, in that case that the plaintiff—

"knew the acknowledging officer, though not named in the trust deed, was a beneficiary thereunder, and hence that the registration thereunder was void."

The facts in the Bostic Case are somewhat complicated, but the ground of the decision is well stated by the Chief Justice in saying:

"The defendants rely upon the subsequent deed from the grantor, and it is the principal creditors who set up the trust deed and rights acquired thereunder, and, when they do so, they are barred by the fact that the registration of the trust deed was not valid, because they knew of its defectiveness" by reason of the invalid probate.

White v. Connelly and Long v. Crews, supra, are cited by the Chief Justice.

"When it does not appear upon the face of the instrument, or otherwise that the officer taking the acknowledgment is disqualified to act by reason of interest, the instrument according to the better rule is entitled to be recorded, and such record becomes effectual as constructive notice as to subsequent purchasers, creditors, or incumbrancers, although authority to the contrary is not wanting." 1 Ruling Case Law, §§ 46-47, p. 274.

No question of this character is presented here. The trustee, an officer of the bank, knew that the probate was taken by Jenkins, who was a stockholder and assistant cashier. No subsequent lien, other than the claim of the plaintiff trustee in bankruptcy, has attached to the property. The validity of the probate and registration are raised by a direct proceeding and the facts are free from complication. If the probate was invalid, it follows that as against the trustee in bankruptcy the registration is without authority and is a nullity. The deed of trust to defendant W. P. Shaw, trustee, having been probated before a stockholder and assistant cashier, was therefore not entitled to registration, and is invalid as against plaintiff, trustee in bankruptcy of J. J. Piland.

A decree will be signed in accordance with this opinion.